*1406 The opinion of the court was delivered by
Watkins, J.
This suit has for object the recovery of $5000 as the amount for which the defendant insured the life of Oonrad Weil, deceased, on policy bearing the No. 577,832 and bearing the date December 12, 1893, the insured having died January 22, 1894.
The defendant’s answer admits the execution of the policy, but denies all liability, charging violation of the warranty clauses of the application and the policy. There was a trial of these issues, a judgment in favor of the defendant, and an appeal on part of the administrator of Oonrad Weil’s estate.
The salient features of defendant’s answer we will reproduce, and they are as follows, viz.:
“ That the late Oonrad Weil, * * * to induce this defendant to issue said policy and to undertake to insure his life, made application in writing for said policy, which said application is a contract of insurance which was issued, only upon the faith of the statements and declarations made and contained in said application.”
That in said application the deceased “made certain statements and representations and gave answers to certain questions propounded to him, and concerning facts then and there unknown to the defendant, but necessary and material to defendant’s risk, in insuring the life (of the deceased) and issuing the policy,” etc.
That in the course of the applicant’s medical examination he was asked if he had “ever had severe headaches, vertigo, fits, or any nervous or muscular trouble,” and answered “no.”
That in truth and fact the deceased had an attack of trigeminal neuralgia in May, 1893, for which he was treated by a physician for the space of one week; that he had a convulsion on the 22d of October, 1893; and that in November, 1893, he was sick of la grippe for the space of about two weeks. “ That all of said facts were concealed by (the deceased), and not reported to the medical examiner of this-.respondent. ’ ’
That he was farther interrogated as to the name and residence of his physician, to which he answered, “ Dr. Randolph, of Alexandria; ” and that he was requested to state “when and for what have his services been required,” to which he answered “Dengue fever, last month.” Thereupon the answer charges that the deceased concealed from the respondent the other diseases above set forth, for which he had consulted a physician and been treated by him.
*1407 That he was further asked “ what other physician have you consulted, when and for what,” and his reply was, “none, and for nothing.” Thereupon the answer represents that “said statements were false and untrue, for the reason that in addition to consulting Dr. Randolph as hereinabove set forth he had, from May 25, 1898, consulted Dr. Smith Gordon of Alexandria, La., for supra-orbital neuralgia, and in June or July (or perhaps later), 1893, the exact date of which is unknown to this respondent, but shortly before the issuance of said policy, the deceased visited the city of New Orleans for the purpose of being examined and treated by Dr. Rudolph Matas. That he was sent to Dr. Matas by his regular physician, the said Dr. Randolph, as an epileptic. That he was treated by the said Dr. Matas several times; was treated by him and received medicine from him.”
Having thus enumerated the various particulars in which the statements and representations of the application of the insured are and were “false and untrue,” and averred that the truthfulness of same was “ necessary and material to defendant’s risk,” the answer declares :
“ That the failure of the said Weil to disclose the material facts herein set forth caused the policy to be absolutely null and void, for the reason that in the application which it was agreed should be the basis of the contract between him and your respondent he warranted the answers to the medical examiner to be full, complete and true, and that the warranty was a condition precedent to and consideration for said policy, which was subsequently issued.
“ That the answers aforesaid being untrue were a breach of the warranty, vitiating the policy and destroying the right to recover thereon.”
The application contains the following clause, on which defendant places reliance, viz.: “That the statements and representations contained in the foregoing application, together with the declarations made by me to the medical examiner, shall be the basis of the contract between me and the New York Life Insurance Company; that I hereby warrant the same to be full, complete and true, whether written by my own hand or not, this warranty being a condition precedent to and a consideration for the policy which may be issued thereon.”
The policy contains a similar provision, viz.:
“ This contract is made in consideration of the written application *1408 for this bond policy, and of the agreements, statements and warranties thereof, which are hereby made a part of this contract,” etc.
Upon the reverse of the policy an abstract of the application, the warranty clause and the declarations of the insured are endorsed, and made parts thereof; and a comparison instituted between the said declarations and the averments of the answer shows that the recitals therefrom in the latter are correct.
The physician who attended deceased during last illness certifies that he died of epilepsy, after a brief illness of three or four days, That he had been his medical adviser for about one year previous, and that he treated the deceased once in May of that year for supra-orbital neuralgia. With regard to the cause of his death, that statement is concurred in by two other physicians who were in attendance during the fatal illness. The statement of one of them is that he also attended the deceased during his attack of neuralgia in May, 1893. That he treated him for a fainting spell on October 22, 1893, and for la grippe in November, 1893. That the attack in May lasted one week, that in October one day, and that in November two weeks. He states that, under the treatment in each instance, the deceased was cured completely. These attacks were previous in date to the application which bears date December 7, 1893.
An examination of the testimony taken at the trial does nob differ materially from the statements of the witnesses made parts of the proof of the death of the insured, which were furnished to the defendant.
The theory of the defendant’s answer is that the application is the primary evidence, on the faith of which only the policy was issued to the insured, and that the validity and binding force of the policy necessarily depends upon the statements and representations which are made in the application.
Upon this theory the answer avers that the deceased made, in his application, certain statements and representations, and gave answers to certain questions propounded to him in the course of his medical examination, which is made part of the application, concerning facts “ then unknown to the defendant, but necessary and material to the defendant’s risk;" and it further represents that “said statements were false and untrue,” and that the truthfulness of same was “ necessary and material to the defendant’s risk.”
Reiterated the representations and statements- alleged to be un *1409 truthful are that he answered that he had never had any “ severe headaches, vertigo, fits, or any nervous or neuralgic trouble,” whereas he had an attack of trigeminal neuralgia in May, 1893, for which he had been treated by a physician for the space of a week; an attack of vertigo or convulsions in October, 1893, for which he was similarly treated for a period of several days; and an attack of la grippe in November, 1893, for which he was similarly treated for a period of two weeks. That these different attacks of illness were by the deceased concealed from the medical examiner, and consequently not made known to the defendant at the time it issued the policy.
And the further defence is predicated upon the fact that when interrogated as to the name and residence of his physician, the deceased only gave the name of Dr. R. D. Randolph, whereas, in truth and fact, he was attended by Dr. Smith Gordon as well as by Dr. Randolph during his attack in May, 1893; and was also examined and prescribed for by Dr. Rudolph Matas, of New Orleans, in May, 1893, at the suggestion of Dr. Randolph, of Alexandria. And in truth and fact he was attended by Dr. Gordon in September and October, 1893.
It is not a point made in the answer that the death of the deceased resulted from an excepted cause in the risk of the defendant; but this testimony is pertinent to show the materiality of the information which was necessary that the defendant should have known in determining whether it would issue a policy, and in enabling the court to estimate the probable effect of the failure of the deceased to make known these facts to the defendant through the instrumentality of his medical examination.
Reviewing the parol testimony of witnesses interrogated at the trial, we find the following facts substantially detailed, viz.:
Dr. Smith Gordon says he first attended the deceased on the 21st of May, 1893, and from the 21st to the 31st, when he turned the patient over to Dr. Randolph. That he treated him for supra-orbital neuralgia; that is to say, neuralgia of the tri-facial nerve.
Dr. Randolph says he attended Oonrad Weil on the 21st of May, 1893, and up to the 28th of that month. On being interrogated with reference to those visits he was asked the question: “ Was there any fainting fit or convulsion, or anything of the kind?” and his reply was: 111 saw no convulsion.” But on being further interro *1410 gated and requested to state what he discovered, he replied that “ it looked like he had fainted.”
It appears from the record that Oonrad Weil paid a visit to Dr. Rudolph Matas, of the city of New Orleans, during the latter part of May or the early part of June, 1893, at the suggestion of Dr. Randolph, of Alexandria. ' His situation is better described in his own language, and it is as follows, viz.:
“That his face indicated suffering which was confirmed by his statement that he had been recently much disturbed by periodical but frequently repeated pains injihe face, in the region of the eyes, cheeks and temples, and that these pains were much more intense in the left side of the face. There was a slight but distinct paralysis of the muscles corresponding to the painful regions, and this paralytic condition was more marked in the external muscles of the left eye and cheek. * * * The patient told me that he had had a fit, or convulsion, during which he lost consciousness, some time previously, and since that (occurrence) he had been seized (of) the pains in his face. He was much worried about his condition, and anxious to be relieved of those pains. He was, also, anxious to ascertain the relationship of the present trouble with his previous convulsion. I was not able to satisfy him in this respect, and I told him I would like to keep him under observation for some time before committing myself to a definite diagnosis.
- “ His condition impressed me as being serious, and that the local face symptoms were simply manifestations of some other grave disorder, or lesion of the central nervous system; but what that other condition was I could not tell.
“From his descriptions I concluded that he had an epileptiform convulsion, which had been caused by some reflex, possibly peripheral irritation of the inflamed nerves of the face * * * The patient came to see me again on two or three occasions, and appeared to me to be much relieved of his pains, and improved as to his paralytic symptoms * * * This apparent improvement led me to encourage the hope of final recovery, but the impression as to the gravity of his condition lingered in my mind.”
Again: “The gravity of epilepsy is in proportion to the frequency and intensity of the convulsive paroxysms. Death very rarely occurs during an attack, but indirectly may cause a fatal issue. * * * At any period the symptoms may lessen and the patient *1411 recover. Many cases, however, end fatally; but fortunately that condition is rare.”
It is from the concurring statements of these three physicians that the situation of Oonrad Weil on the 21st to 31st of May, 1893, was demonstrated.
Nothing further occurred that is worthy of note until the 11th of the following September, when Dr. Smith Gordon had occasion to visit him again professionally.
With respect to that visit the following occurred, viz.:
Q,. For what purpose (did you visit him) ?
A. Well, he w’as ill. I was there professionally.
Q. Do you remember what for?
A. Well, I can not say positively what the trouble was; he was over his chief trouble when I reached him.
Q. How long did you treat him on that occasion?
A. Only for two days; I made another visit to him on the 12th.
Q. Did you treat him at any other time in 1893?
A. On the 17th of October; also on the 22d of October.
Q. For what?
A. I' don’t know. I can not say exactly. The diagnosis was indefinite.
*********
Q. Was he confined to his bed at all jn May, do you know?
A. He was confined to his bed from the 21st to the 31st of May. Yes, sir. Or to his house. I realiy do not know whether he was in bed or not.
Q. Was (he confined to his bed) on the 7th of October?
A. Then, of course, he was confined to his house.
In speaking of the fatal illness of Oonrad Weil the doctor was requested to state if, in his opinion, that was the first time he had suffered from this disease, and he replied: “No, sir; I think he had epilepsy before that, but I did not know it. I think two of the previous attacks must have been epilepsy — those when it was claimed he had the fainting fits. One of these was in September and the other probably in October. But two, I am sure, in which the family thought he had fainted. Really, I have no doubt they were mild attacks of epilepsy.”
Dr. Randolph supplements this statement thus: That on the 26th of October, 1893, Oonrad Weil came to him and requested him “to *1412 make a very thorough physical examination and see if he could find anything wrong about his health,” etc.
Leaving out of view the attack of la grippe, or dengue fever, with which the deceased was affected in November, 1893, it strikes our minds with irresistible force that the materiality of the information with respect to Conrad Weil’s physical condition, during several months prior to the defendant’s undertaking a risk upon his life, is fully established, and that this information was most material for the defendant to have known in determining whether it would or not issue a policy on his life.
And the foregoing testimony is fortified by the further statement of Dr. Smith Gordon with reference to the fatal illness of the insured, viz.:
“ I did not see him at the beginning of the attack. . He fell upon the floor of his store, so it was stated to me when I found him. He was in a comatose state — the secondary condition of an epileptic fit. He had a recurrence of those attacks from time to time until the period of his death, thirty-six or forty-eight hours afterward. I think he must have had twenty or thirty fits, continuing up to the time of his death.”
The manner and circumstances of his death clearly indicate the carefulness of Dr. Matas’ examination of the patient in May previously, and the correctness of his partial diagnosis then made.
Dr. Johnston, the medical examiner, says, as a witness at the trial, that if he had known that the deceased “had been treated for diseases (before his examination) he would not have passed him as a first-class risk, and it had been proved since that he had been treated before. In other words, if he had known then what he knew when testifying, he would not have passed him as a first-class risk.”
In determining the probable effect of the deceased not having made these facts known to the medical examiner, the court is greatly assisted by the sworn testimony of the examiner at the trial.
It is unnecessary that we should discuss the question of the probable truthfulness of the statement of the deceased, or the wilful suppression of the facts in the course of his medical examination. This is altogether unnecessary for the decision of this case, the only question being whether withholding the foregoing material facts on the part of the insured constituted a violation of his warranty to *1413 the defendant which rendered the policy of insurance void ab initio.
Recurring to the averments of the answer, we find them to be that to induce the company to undertake to insure his life, the insured made an application in writing for the issuance of a policy of insurance, “ which said application is a contract of insurance,” and that the policy of insurance was issued only upon the faith of the statements and declarations which are made and contained in said application.
The charge is then made that certain fq,ets concerning the physical condition of the applicant, during the several months next preceding his application, which were material to the risk, and necessary for the defendant to have known in determining whether it would undertake the insurance of the life of the deceased, were neither disclosed in his application, nor in his medical examination, which constituted an integral part thereof; and that, in failing to make these material and necessary disclosures, the answers of the applicant to the interrogatories of the medical examiner were, of necessity, untrue.
The answer then avers that the failure of the applicant to make the aforesaid disclosures rendered the policy void ab initio, for the reason that he had, in his application, warranted his answers to the medical examiner to be full, complete and true; and that this warranty was a condition precedent to, and a consideration for, the policy of insurance — the falsity or material insufficiency of the answers constituting a breach of the warranty, and vitiating the policy.
As previously observed, the application declares that the statements and representations therein contáined, together with the declarations made to the medical examiner, shall form the basis of the contract of insurance between the insurer and insured, and that the same shall constitute full warranty of their truthfulness, and be a condition precedent to and a consideration for the policy.
And the recitals of the policy are to the effect that the contract of insurance is made in consideration of the written application of Conrad Weil therefor, and “the agreements, statements and warranties thereof, which are hereby made a part of this contract.”
Upon the reverse of the policy is endorsed a copy of the application, the medical examination of the deceased, and the warranty *1414 clause of the contract, thus making of them one complete and homogeneous whole.
It is to this condition of the contract for, and the policy of insurance, as interpreted by the evidence we have detailed, that we are to apply the law and determine the liability vel non of the defendant. As counsel for the plaintiff mainly rely for a reversal of the judgment upon the decision of the Supreme Court in Mouler vs. American Life Insurance Company, 111 U. S. 335, and have made elaborate quotations therefrom in their brief we will reproduce same, as we have compared them with the text and found them to be correct.
We quote from the syllabus of the decision:
“ The principal reaffirmed, that when a policy of insurance contains contradictory provisions, or has been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicants’ statements to be a condition precedent to any binding contract, the court should lean against that construction which imposes upon the assured the obligations of the warranty. ” (Italics ours.)
“ An applicant for a life insurance was required to state, categorically, whether he had ever been afflicted with certain specified diseases. He answered that he had not. Upon an examination of the several clauses of the application, in connection with the policy, it was held to be reasonably clear that the company required, as a condition precedent to a valid contract, nothing more than that the insured would observe good faith toward it, and make full, direct and honest answers to all questions, without evasion or fraud, and without suppression, misrepresentation or concealment of facts with which the company ought to be made acquainted.
“In the absence of explicit stipulations requiring such an interpetation it should not be inferred that the insured took a life policy with the understanding that it should be void, if at any time in the past he was, whether conscious of the fact or not, afflicted with diseases, or any of them, specified in the questions propounded by the company. Such a construction of the contract should be avoided, unless clearly demanded by the established rules governing the interpretation of written instruments.”
On the merits of that case the court says:
1 ‘ The main defence was that the insured had been afflicted with *1415 scrofula, asthma and consumption prior to the making of his application, and that in view of his statement that he had never been so afflicted, the policy was by its terms null and void. There was, undoubtedly, evidence tending to show that the insured had been afflicted with those diseases, or some of them, prior to his application ; but there was also evidence tending to show that he was then in sound health; but that at the time of the application he did not know or believe he had ever been afflicted with any of them in a sensible, appreciable form.” The Circuit Court instructed the jury just what is contended for by the counsel for the defendant in the case at bar: “It is of no consequence, in such case, whether he knew it to be untrue or not; he bound himself for its correctness, and agreed that the validity of his policy should depend upon its being so.” Again: “That he, the insured, did not know he was then afflicted is of no consequence whatever, except as it may bear upon the question, ‘ Was he afflicted? ’ If he was, his answer (for the truth of which he bound himself) was untrue, and his knowledge, or absence of knowledge, on thesubjectis of no consequence.” Further: “You (the jury) must determine whether the insured was at any time afflicted with either of the diseases named. If he was, his answer in this report is untrue, and notwithstanding he may have ignorantly and honestly made it, the .policy is void and no recovery can be had upon it.”
These charges were severally excepted to by the counsel for plaintiff, and the United States Supreme Court held them all to be erroneous and remanded the case. :
The court in this ease cites with approval the following language from the case of National Bank vs. Insurance Company, 95 U. S. 673: “Where a policy of insurance contains contradictory provisions, or has been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicant’s statement to be in a condition precedent to any binding contract, the court should lean against that construction which imposes upon the insured the obligation of a warranty. The company can not justly complain of such a rule. Its attorneys, officers or agents prepared the policy for the purpose, we should assume, both of protecting the company against fraud, and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret, *1416 and it is both reasonable and just that its own words should be construed most strongly against itself.” Citing, Grace vs. American Insurance Company, 109 U. S. 278-282, the court proceeds to say:
“ These rules of interpretation, equally applicable in cases of life insurance, forbid the conclusion that the answers to the questions in the application constitute warranties, to be literally and exactly fulfilled, as distinguished from representations which must be substantially performed in all matters material to the risk ;■ that is, in matters which are of the essence of the contract.'”
As to what is the proper signification of the word “ true ” in insurance contracts the decision is remarkably clear and explicit. We quote from page 345 of the opinion:
“ The entire argument in behalf of the company proceeds upon a too liberal interpretation of those clauses in the policy and applica - tion which declare the contract null and void if the answers of the insured to the questions propounded to him were, in any respect, untrue. What is meant by ‘true’ and ‘untrue’ answers? In one sense, that only is true which is conformable to the actual state of things. In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense, the ward ‘true’ is often used as a synonym for honest, sincere, not fraudulent.” In that case the court sums up the whole matter as follows:
“The jury should have been instructed, so far as the matters here under examination are concerned, that the plaintiff was not precluded from recovering on the policy unless it appeared from all the circumstances, including the nature of the diseases with which the insured was alleged to have been afflicted, that he knew, or had reason to believe, at the time of his application, that he was or had been so afflicted.”
Oomparing the foregoing quotation with the terms of Oonrad Weil’s application and the defendant’s policy it is evident that we are dealing with a different instrument, as it is perfectly clear, upon casual observation, that from the syllabus and opinion, in so far as it is quoted, the Supreme Court dealt with a policy of insurance, with regard to the correct interpretation of which they entertained grave and serious doubts. This is evidenced by the statement “that when a policy of insurance contains contradictory provisions, or has been so framed as to leave room for construction, rendering it *1417 doubtful whether the parties intended the exact truth of the applicant’s statements to be a condition precedent to any binding contract, the court should lean against that construction which imposes upon the assured the obligation of warranty.”
Therefore the policy of insurance then under consideration did contain “ contradictory provisions,” and was “ so framed as to leave room for construction;” and such being the case the court inclined “ against that construction which imposed.upon the assured the obligation of warranty.”
For our examination counsel for the defendant has produced a complete transcript of that case, which contains a copy of the insurance policy, which the court then interpreted; and an examination thereof has disclosed the following as the controlling recitals thereof, viz.:
“ This policy witnesseth that the American Life Insurance Company, in consideration of the representations made to them in the application for this policy * * * do insure the life of Louis Moulor, of New Orleans, * * * in the sum of ten thousand dollars.”
Again—
“And it is hereby agreed and declared that if the representations and answers made to this company in the application for this policy, upon the full faith of which it is issued, shall be found to be untrue in any respect, or that there has been any concealment of facts, then, and in such case, this policy shall be null and void.”
In Moulor’s “application for insurance ” the following stipulation occurs, viz.:
“It is hereby declared and warranted that the above are fair and true answers to the foregoing questions; and it is acknowledged and agreed by the undersigned that this application shall form a part of the contract of insurance, and that if there be, in any of the answers herein made, any untrue and evasive statements, or any misrepresentations or concealment of facts, then any policy granted upon this application shall be null and void,” etc.
Referring to the opinion of the court in the Moulor case, we find a striking paragraph explanatory of the conditions and stipulations of that policy, to which plaintiff’s counsel make no reference at all.
It is as follows, viz.:
“We have seen that the application contains a stipulation that it *1418 shall form a part of the contract of insurance; also that the policy purports to have been issued upon the faith of the representations and answers in that application. Both instruments, therefore, may be examined to ascertain whether the contract furnishes a uniform fixed rule of interpretation, and what was the intention of the parties. Taken together, it can not be said that they have been so framed as to leave no room for construction. The mind does not rest firmly in the conviction that the parties stipulated for the literal truth of every statement made by the insured. There is, to say the least, ground for serious doubt as to whether the company intended to require, and the insured intended to promise, an exact, literal fulfilment of all the declarations embodied in the application.
“ It is true that the word ‘warranted’ is in the application; and, although a contract might be so framed as to impose upon the insured the obligations of a strict warranty, without introducing into it that particular word, yet it is a fact, not without some significance, that that word was not carried forward into the policy, the terms of which control, when there is a conflict between its provisions and those of the application. The policy upon its face characterizes the statements of the insured as representations. Thus we have one part of the contract apparently stipulated for a warranty, while another part describes the statements of the assured as representations. The doubt as to the intention of the parties must, according to the settled doctrine of the law of insurance, recognized in all the adjudged cases, be resolved against the party whose language it becomes"'necessary to interpret. The construction must, therefore, prevail which protects the insured against the obligations arising from strict warranty'1'’ (our italics) ; pp. 342, 343.
This just and appropriate rule of construction was well and aptly applied in that case. It is the basis of that decision. The application, preceding the issuance of the policy, was looked into for the purpose of ascertaining the nature and character of the proposed obligations of the insured; but the terms of the policy were interpreted as controlling the contract of insurance which was actually entered into and binding upon the company. And, as the policyIwas found to contain no clause stipulating for a strict warranty, and it did not recite that (he application formed a part thereof, that fact was construed in favor of the insured. But in the instant case the policy is altogether different. It stipulates in express terms as follows, viz.:
*1419 “I do hereby agree as follows: (1) That the statements and'representations contained in the foregoing application, together with those made by me to the medical examiner, shall be the basis of the contract between me and the New York Life Insurance Company; that I warrant same to be full, complete and true.”
In discussing the theory which the Circuit Court entertained, the Supreme Court employed this language, viz.:
“ The Circuit Oourt plainly proceeded upon the ground that the knowledge and belief (of the insured) as to having been afflicted with the diseases specified, or some of them, was not an essential element of the contract; in other words, if the assured ever had, in fact, any one of the diseases mentioned in his answer to the seventh question, there could be no recovery, although the jury should find from the evidence that he acted in perfect good faith, and had no reason to suspect, much less to believe or know, that he had been so afflicted.

“If upon a reasonable interpretation, such was the contract, the duty of the court is to enforce it according to its terms; for the law does not forbid to a contract for life insurance to stipulate that its validity should depend upon conditions or contingencies such as the court below decided were embodied in the policy in the suit.

“The contracts involved in Jeffries vs. Life Insurance Company, 22 Wall. 47, and Ætna Life Insurance Company vs. France, 91 U. S. 510, were held to be of that kind. But unless clearly demanded by the established rules governing the construction of written agreements, such an interpretation ought to be avoided.”
This case seems to come clearly within the rule which was relied upon by the Circuit Court in deciding that case in the first instance.
But plaintiffs’ counsel cite and confidently rely on Alabama Gold Life Insurance Company vs. Johnson, 2 So. Rep. (Ala.) 125, as strengthening and fortifying the theory which they insist is announced as controlling the decision of the Supreme Court in the Mouler case.
Counsel for the defendant has brought up for our examination a certified copy of the life policy which was therein construed, and from it we have made the following pertinent extracts, viz.:
“ This policy of insurance witnesseth that the Alabama Gold Life. Insurance Company, in consideration of the representations made to *1420 them in the application for this policy of insurance * * * do insure the life of,” etc.
Again:
“ And it is also understood and agreed by the within assured to be the true intent and meaning hereof, that if the declaration, or any part thereof, made by or for the insured, in the application for this policy, * * * and upon the faith of which this policy is made, shall be found in any respect untrue, then, and in such case, this policy shall be null and void.”
Again:
“ And it is further agreed, and the same is made a part of this contract.” (Vide p. 127 of opinion for extracts from policy.)
It contains, neither in terms nor in substance, any stipulation of warranty, on the faith of which the insurance company issued its policy.
The opinion of the Alabama court thus presents its interpretation of the policy of insurance:
“The question of the most importance which is raised by the rulings of the court in this case is whether the answers made by the assured to the questions contained in the application for insurance are to be construed as absolute warranties,or in the nature of mere representations. The distinction between a warranty and a representation in insurance is frequently a question of difficulty, especially in the light of more recent decisions, which recognize the subject as one of growing importance in its relations particularly to life insurance. As a general rule it has been laid down that a warranty must be a part and parcel of the contract of insurance, so as to appear, as it were, upon the face of the policy itself, and is in the nature of a condition precedent. It may be affirmative of some fact or only promissory. It must be strictly complied with or literally fulfilled before the assured is entitled to recover on the policy. If need not be material to the risk, for, whether material or not, its falsity or untruth will bar the assured of any recovery on the contract, because the warranty itself is an implied stipulation that the thing warranted is material. It further differs from a representation in creating on the part of the assured an absolute liability, whether made in good faith or not. A representation is not, strictly speaking, a part of the contract of insurance or of the essence of it, but rather something collateral or preliminary, and in the nature of an *1421 inducement to it. A false representation, unlike a false warranty, will not operate to vitiate the contract or avoid the policy, unless it relates to a fact actually material or clearly intended to be made material by the agreement of parties. It is sufficient if representations be substantially true. They need not be strictly or literally so. A misrepresentation renders the policy void on the ground of fraud, while a non-compliance with a warranty operates as an express breach of the contract.”
This much of the opinion bears directly upon the principal issue in the instant case and is conclusively in favor of the contention of the defendant. It is in strict keeping with the principles we have extracted from the opinion in the Moulor case.
But after announcing the rule above formulated as applicable to policies of insurance containing a warranty clause, the court then states the principles of the law of insurance, which are applicable to the policy of insurance under consideration, and which, as has been shown, contains no covenant of warranty whatever. The opinion proceeds as follows, viz.
“ The mere fact that a statement is referred to, or inserted in the policy itself, so as to appear on its face, is not alone now considered as conclusive of its nature as a warranty, although it was formerly considered otherwise. Whether such statement shall be construed as a warranty or a representation depends rather upon the form of expression used, the apparent purpose of the insertion, and its connection or relation to other parts of the application and policy, construed together as a whole, where these papers constitute one entire contract, as they most frequently do.” Quoting: Bliss Insurance, Sec. 43, et seq.; Price vs. Phœnix Mutual Insurance Company, 17 Minn. 497; 10 Am. Rep. 166-172.
“In construing contracts of insurance, there are some settled rules of construction bearing upon this subject which we may briefly formulate as follows: (1) The courts, being strongly inclined against forfeitures, will construe all the conditions of the contract, and the obligations imposed liberally in favor of the insured, and strictly against the insurer. (2) It requires the clearest and most unequivocal language to create a warranty, and every statement or engagement of the assured will be construed to be a representation, and not a warranty, if it be at all doubtful in meaning, or the contract contains contradictory provisions relating to *1422 the subject, or be otherwise reasonably susceptible of such construction. The court, in other words, will lean against that construction of the contract which will impose upon the assured the burdens of a warranty, and will neither create nor extend a warranty by construction. (3) Even though a warranty in name or form be created by the terms of the contract, its effect may be modified by other parts of the policy, or of the application, including the questions and answers, so that the answers of the assured, so often merely categorical, will be construed not to be a warranty of immaterial faces stated in such answers, but rather a warranty of the assured’s honest belief in their truth, or, in other words, that they were stated in good faith. The strong inclination of the courts is thus to make these statements and answers binding only so far as they are material to the risk, where this can be done without violence to the clear intention of the parties expressed in unequivocal and unqualified language to the contrary. In support of these deductions, we need not do more than refer to the following authorities: Moulor vs. American Life Ins. Co., 111 U. S. 335, 4 S. Rep. 466; National Bank vs. Insurance Co., 95 U. S. 673; Price vs. Phœnix Mut. Life Ins. Co., 10 Amer. R. 166, supra; Southern Life Ins. Co. vs. Booker, 9 Heisk. 606, 24 Amer. Rep. 344; Fitch vs. American Ins. Co., 59 N. Y. 557, 17 Amer. Rep. 372; Bliss, Ins., Sec.34; Campbell vs. New England Mutual Life Ins. Co., 98 Mass. 381; Fowler vs. Ætna Fire Ins. Co., 16 Amer. Dec., note, 463, 466; Piedmont, etc., Ins. Co. vs. Young, 58 Ala. 476; Parsons on Contracts, 465; Glendale Woolen Co. vs. Protection Ins. Co., 54 Amer. Dec. 309, 320; Wilkinson vs. Connecticut Mut. Life Ins. Co., 30 Iowa, 119, 6 Amer. Rep. 657; 1 Phil. Ins., Sec. 338; Ang. Ins., Secs. 147, 147 a.”
Finding that the policy contained no stipulation of warranty, the court held that the statements and representations of the insured were binding on him only in so far as they were material to the risk; and finding that the alleged misrepresentations related to matters which were immaterial to the risk, rejected the pretensions of the insurance company, and affirmed a judgment enforcing the policy.
The foregoing synopsis of the quoted cases will serve as a full and sufficient citation of adjudications,, as the true distinction between policies containing covenants of warranty and those which do not, and it is so clearly and forcibly made, and backed with authorities, that any further argument would prove to be a work of supererogation.
*1423 With respect to warranty we have extracted from May on Insurance the following, viz.:
“In all contracts of insurance, certain statements are made, certain stipulations are entered into, etc.
* * * * * * *
“Asa general rule, if these statements, stipulations, etc., are contained in, or explicitly made a part of the policy, they become warranties, and are so denominated in the law of insurance.
* * * * * * *
“ An express warranty is a stipulation inserted in writing on the face of the policy, on the literal truth or fulfilment of which the validity of the entire contract depends. This is the definition given by Arnold, which has met with general acceptance. 2 Arnold’s Insurance, 577. By warranty the insured stipulates for the absolute truth of the statement made and the strict compliance with some promised line of conduct, upon penalty of forfeiture of his right to recover, in case of loss, should the statement prove untrue, or the course of conduct promised be unfulfilled. A warranty is an agreement in the nature of a condition precedent, and like that must be strictly complied with.” May on Insurance, See. 156.
Again:
“ Whether the fact stated, or the act stipulated for, be material to the risk or not, is of no consequence, the contract being that the matter is as represented, or shall be promised; and, unless it prove so, whether from fraud, mistake, negligence, or other cause, not proceeding from the insurer, the intervention of law, or the act of God, the insured can have no claim. * * *
“Indeed, one of the very objects of warranty is to preclude all controversy about the materiality or the immateriality of the statement.
“ The only question is, has the warranty been kept ?
“ There is no room for construction; no latitude, no equity. If the warranty be a statement of facts, it must be literally true. If a stipulation that a certain act shall or shall not be done, it must be literally performed.” Ibid.; 1 Bacon’s Life Ins., See, 104, et seq.
Applying the principles of law herein above related to the application of the insured, and to the policy of insurance issued by the company, there is in our minds no possible doubt that there was a breach of the warranty by the insured, on the faith of which the in *1424 surer undertook the risk. "We might go one step further and admit, for the argument, a proposition not admissible in law, that a covenant of warranty only guarantees the truthfulness of a statement of facts which is material to the risk, and yet, on the proof, the plaintiff would not be entitled to recover.
Judgment affirmed.
Nicholls, O. J., absent.